**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

**In re:**

| | | |
|---|---|---|
| **ORIS AUTOMOTIVE PARTS** | ) | **Case No. 06-00813-TOM-11** |
| **OF ALABAMA, LTD.,** | ) | **Chapter 11** |
| | ) | |
| **Debtor.** | ) | |

| | | |
|---|---|---|
| **ORIS AUTOMOTIVE PARTS** | ) | |
| **(ALABAMA) LTD.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Adv. Proc. No. 06-00165-TOM** |
| | ) | |
| **FLEX-N-GATE CORPORATION AND** | ) | |
| **FLEX-N-GATE ALABAMA, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION</u>

This matter came before the Court for trial on September 25, 2007 and September 26,

2007 on the Complaint (adv. proc. doc. no. 1[1]) filed by Oris Automotive Parts of Alabama, Ltd.

("Oris" or the "Debtor") and the Answer to Complaint (adv. proc. doc. no. 3) filed by Flex-N-

Gate Corporation and Flex-N-Gate Alabama, LLC (each individually a "Defendant" and,

collectively, the "Defendants").  Appearing at the hearing for the Plaintiff were Michael L. Hall,

Ricky J. McKinney and Jennifer B. Kimble.  Appearing at the hearing for the Defendants were

Timothy M. Lupinacci and James H. White.  This Court has jurisdiction under 28 U.S.C. §

1

1334(b) and 28 U.S.C. § 157 (b)(1) and (b)(2)(N).  Following the two-day trial, the parties

submitted post-trial briefs and replies and the Court has considered the pre-trial briefs, post-trial

briefs, replies, exhibits, arguments of counsel, the evidence, and the law, and finds and concludes

as follows:

<u>THE UNDERLYING BANKRUPTCTY CASE</u>

On March 16, 2006 (the "Petition Date"), Oris filed for protection under the United States

Bankruptcy Code, Title 11, Chapter 11.  Pre-petition, the Debtor manufactured parts that were

used in the automotive industry by certain original equipment manufacturers ("OEM") in the

production of vehicles.  The Debtor's main customers, as of the Petition Date, were Mercedes

Benz U.S. International, Inc. ("Mercedes"), BMW, and Volkswagen.

On May 23, 2006, Flex-N-Gate Corporation ("FNG" or the "Purchaser") and the Debtor

executed an Expression of Interest (the "Letter of Intent") in which FNG offered to purchase

substantially all of the Debtor's assets for $6.3 million.

On May 24, 2006, the Debtor filed *Debtor's Motion for Orders Under 11 U.S.C. §§*

*105,363, 365, 1146(c), and Fed. Bankruptcy Rules 2002, 6004, 6006 and 9014: (I) Approving*

*Asset Purchase Agreement and Bidding Procedures for Sale of the Debtor's Assets Free and*

*Clear of Liens, Claims, Encumbrances and Interests; (ii) Approving Such Sale to Buyer Subject*

*to Higher and Better Offers; (iii) Authorizing Assumption and Assignment of Certain Executory*

*Contracts in Connection with Such Sale; and (iv) Authorizing the Transfer of Assets Free and*

*Clear of Liens, Claims and Encumbrances, and (v) Scheduling Hearings Thereon, and*

---

[1]References to documents filed in the adversary proceeding are referred to as "adv. proc. doc. no." while references to documents filed in the underlying bankruptcy case are referred to as "doc. no."

2

*Approving Form, Manner and Sufficiency of Notice Thereof* (the "Sale Motion") (doc. no. 194).

The Sale Motion sought entry of an order authorizing the sale of substantially all of the Debtor's real property, equipment, inventory, furniture, intellectual property, customer lists, trade secrets and other assets used in the Debtor's operations at its McCalla, Alabama facility. To that end, the Debtor sought approval of certain bidding procedures including naming FNG as the stalking horse bidder subject to higher and better offers at an auction on a date to be determined by the Court. A hearing on the Sale Motion was set for June 1, 2006. Objections to the Sale Motion were filed by Mercedes (doc. no. 199), the Unsecured Creditors' Committee (doc. no. 205) and AmSouth Bank (doc. no. 210).

At the hearing on June 1, 2006, all objections were resolved and the Court entered its *Order (A) Approving Sale Procedures and Bid Protections in Connection with Sale of Certain Assets Owned by the Debtor; (B) Scheduling an Auction and Hearing to Consider Approval of the Sale; (C) Approving Notice of Certain Dates, Times and Places; and (D) Granting Related Relief* (the "Bid Procedures Order") (doc. no. 212). Additionally, a *Notice of Auction and Sale Hearing* (the "Notice") (doc. no. 213) was served on all interested parties as set forth in the Notice.

Pursuant to the Bid Procedures Order and the Notice, an auction was scheduled for June 19, 2006 at 9:00 A.M. at the offices of counsel for the Debtor and a hearing on approval of the sale was scheduled for later that day, June 19, 2006, at 11:00 A.M (the "Sale Hearing"). Also pursuant to the Bid Procedures Order, FNG was named the stalking horse bidder based on FNG's Letter of Intent. The Bid Procedures Order further ordered that the assets subject to the Letter of Interest were to be sold "as is," "where is," without any representation or warranty of any type

3

whatsoever except that the Debtor has and owns the good and marketable title to the assets being offered for sale.

On June 9, 2006, FNG and Oris entered into that certain Asset Purchase Agreement (the "APA") pursuant to which FNG agreed to purchase substantially all of the assets of Oris. A copy of the APA was filed with the Court on June 10, 2006 (doc. no. 219) and the schedules to the APA were filed on June 16, 2006 (doc. no. 244).

At the auction on the morning of June 19, 2006, no other parties appeared to bid on the assets and the Debtor presented the sale to FNG to the Court at the Sale Hearing. Prior to the Sale Hearing, objections to the sale were filed by the Unsecured Creditors' Committee (doc. no. 225), Oris Fahrzeugteile Hans Riehle GMBH ("Oris Germany"), as amended (doc. nos. 231, 251), Mercedes (doc. no. 232), and Regions Bank (doc. no. 239). At the hearing on June 19, 2006, all objections were either withdrawn or resolved by agreement of the parties, with certain reservation of rights, and the Court entered an *Order Under 11 U.S.C. §§ 105, 363, 365 and 1146(c) Approving (i) Asset Purchase Agreement with Buyer and Debtor's Assumption of Obligations Thereunder, (ii) Sale Free and Clear of all Liens, Claims, Interests and Encumbrances, and (iii) Rejection or Assumption and Assignment of Certain Related Executory Contracts*, as amended (the "Sale Order") (doc. nos. 252, 254). The Sale Order approved the sale to FNG for $6.3 million as the highest and best offer, subject to adjustments for inventory.

The sale closed on June 23, 2006 (the "Closing Date") and the Purchaser paid $6.3 million with $4.3 million attributable to real property and equipment and $2.0 million attributable to inventory. As discussed below, $5.7 million was paid to Oris at closing and $600,000 was escrowed subject to the final Inventory Value adjustment.

4

Two and a half months after the Closing Date, none of $600,000 of escrowed funds had been released to the Debtor and, on September 13, 2006, the Debtor instituted this adversary proceeding against the Defendants. In the Complaint (adv. proc. doc. no. 1), the Debtor alleges breach of contract and unjust enrichment and seeks damages of $941,000.00 plus attorneys' fees and costs. The Debtor sought release of the $600,000 being held in escrow plus an additional $341,000 in inventory the Debtor asserts FNG received but did not pay for. In their Answer (adv. proc. doc. no. 3), the Defendants assert that the Purchaser has performed all of its contractual obligations and paid all amounts due and owing.

Following the filing of this adversary proceeding, the parties, as well as numerous other parties involved in the bankruptcy case who were involved in a different dispute but all embroiled with the Debtor's bankruptcy case, attended two settlement sessions, one on May 7, 2007 and one on May 14, 2007. Judge Margaret Mahoney, United States Bankruptcy Court for the Southern District of Alabama, served as the Settlement Judge. Following the second session, most of the overall issues in the underlying bankruptcy case were resolved; however, only certain of the issues raised in this adversary proceeding were settled. In the underlying bankruptcy case, on June 5, 2007, the parties filed a *Joint Motion to Approve Settlement* (doc. no. 757). The motion was heard on June 18, 2007, after the Court granted the *Motion to Shorten the Applicable Notice Period for a Rule 9019 Motion to Approve Settlement* (doc. no. 758) filed by Mercedes. On June 19, 2007 the *Order Granting Motion to Approve Settlement* (doc. no. 778) was entered and, pursuant to the order and paragraph 10 of the settlement agreement, attached as Exhibit A to the order, Mercedes became the party in interest in this adversary proceeding with the right to pursue any unpaid sale proceeds from FNG. Accordingly, at trial, Mercedes was

5

substituted as the party in interest for the Debtor/Plaintiff.  References to the Plaintiff therefore refer to Oris with respect to actions prior to the settlement and to Mercedes thereafter.

The Debtor's disclosure statement was approved on August 6, 2007 (doc. no. 818) and the Debtor's plan of liquidation was confirmed on October 24, 2007.

<u>FINDINGS OF FACT</u>

The Court notes at the outset that it finds the Plaintiff's witnesses[2] to be knowledgeable, credible and very familiar with the sale and the operations of the Debtor.  Though the Court finds the Plaintiff's witnesses more credible, the Court will use the Defendants' figures in reaching its conclusion based on the Plaintiff's post-trial pleadings adopting those figures, for the sake of simplicity.

**A.      Due Diligence Leading to Execution of the APA**

Simultaneous with filing the bankruptcy case, the Debtor filed an *Application for an Order Authorizing the Retention and Employment of Finley, Colmer & Company as Chief Restructuring Officer and Chief Operating Officer for the Debtor and Debtor in Possession* (the "Application") (doc. no. 8).  The Application asserted that employment of Peter Colmer, as chief restructuring officer, was a condition precedent to the Debtor obtaining post-petition financing. The Application was granted on March 16, 2006 following an emergency hearing on certain first day motions (doc. no. 26).

---

[2] The Court notes that Mr. Colmer came across as a bit agitated at trial but that does not affect this Court's reliance on his testimony.  The Court is very familiar with Mr. Colmer and his company and his experience in bankruptcy cases, with asset sales and with the management of financially distressed companies. Further, he has testified in this Court in different cases on multiple occasions.

6

At trial, Mr. Colmer testified that he determined, early in the bankruptcy case, that Oris "was not operating efficiently, was not generating positive cash flow" and that Oris's "chances of reorganization were…slim" (Trial Tr. vol. 1, 73, Sept. 25, 2007).  Based on that assessment, Mr. Colmer and Marc Watson, the Chief Operating Officer of the Debtor employed pursuant to the order on the Application, decided to pursue a section 363 asset sale to maximize value for the Debtor's creditors.  Id.

Shortly after the Petition Date, James Zsebok, Director of Mergers and Acquisitions for Ventra Group, a subsidiary of Flex-N-Gate Corporation, contacted Mr. Colmer and expressed an interest in Oris and inquired about conducting due diligence (Trial Tr. vol. 1, 74, September 25, 2007).  Mr. Colmer testified that three representatives from FNG, Mr. Zsebok, Nick Sleiman, director of manufacturing for the Defendants, and Kevin Hamilton, Vice-President of FNG, flew to Alabama for a diligence visit in early April 2006.  Mr. Sleiman later testified that Paul Mapp[3], also from FNG, participated in this initial diligence visit as well (Trial Tr. vol. 1, 141, Sept. 25, 2007).  Following that visit, Mr. Colmer sent Mr. Zsebok an email, dated April 11, 2006, in which Mr. Colmer commented on the diligence visit that took place earlier that day, attached certain data for review and offered to "get any additional information you need whether it is resident in the US or Germany" (Trial Tr. vol. 1, 100, Sept. 25, 2007; Defendants' Exhibit 100).  Within the diligence package is a spreadsheet labeled "Appendix 6A-Inventory Detail at

---

[3]There was no testimony on what Mr. Mapp's role was during the initial visit or what Mr. Mapp's position was with the Defendants at the time of the visit.

Petition" which purports to show a total physical inventory count, as of the Petition Date, of $2,988,637.00[4].

After signing the Letter of Intent, FNG was given access to additional information to assist in coming to terms with the Debtor on an asset purchase agreement (Trial Tr. vol. 2, 196, Sept. 26, 2007).  Included in the information presented to FNG was a schedule of inventory containing inventory FNG agreed to purchase and additional inventory which FNG may or may not decide to purchase (Trial Tr. vol. 2, 199, Sept. 26, 2007).  The APA was executed on June 9, 2006 and the parties proceeded to move towards the Sale Hearing and a possible closing.

A second, more intensive, diligence visit, with a larger team of representatives from FNG, was conducted in May 2006, which was done in conjunction with FNG's development of the Letter of Intent, which ultimately, as noted above, was executed on May 23, 2006.  Id at 77.  In the Letter of Intent, FNG offered to purchase substantially all of the Debtor's assets for $6.3 million.  The Letter of Intent was signed by Mr. Hamilton, Vice-President of FNG and a member of the original diligence team, and by Mr. Colmer, on behalf of the Debtor.

Mr. Colmer testified at trial that, leading up to the closing, FNG sent a number of people to "look at, analyze, assess every single aspect" of how Oris worked and that FNG understood the bill of materials, the supply chain, the customer base, the facility, and human resources (Trial Tr. vol. 1, 91, Sept. 25, 2007).  Additionally Mr. Colmer testified that for a couple of weeks prior to closing, FNG maintained a significant commitment of resources in terms of personnel at Oris

---

[4]The spreadsheet is date stamped 9/24/2007 10:10 AM; however, the Court understands that many of these documents were printed right before trial and, accordingly, does not give any weight to the date or time listed on the spreadsheet (Trial Tr. vol. 1, 101-02, 116, Sept. 25, 2007).

8

and that FNG was "completely familiar with how we [Oris] were doing business" (Trial Tr. vol. 1, 91, Sept. 25, 2007).

At the Sale Hearing on June 19, 2006, Mr. Colmer testified that Oris initially contacted 20 strategic groups and 87 other entities about a sale of Oris's assets. Ultimately, there were two groups that conducted significant due diligence. One group visited the Alabama facility three times and visited the Mercedes and Oris Germany facilities in Europe. That entity, however, ultimately did not participate in the auction. Mr. Colmer testified, at the Sale Hearing[5], that FNG likewise conducted extensive diligence both in Alabama and in Europe[6].

At trial, Mr. Sleiman testified that FNG did visit a supplier in Toronto, Canada, JWE though he was unsure whether this visit occurred prior to the Closing (Trial Tr. vol. 1, 180, Sept. 25, 2007). Mr. Sleiman further testified that FNG never visited any other off-site suppliers, which contradicts Mr. Colmer's testimony at the Sale Hearing. Id. FNG presented testimony from four employees as witnesses during the trial and it appeared that they were not familiar with each others' roles before, during or after the sale. Mr. Colmer, on the other hand, was involved

---

[5] Pursuant to Rule 201 of the Federal Rules of Evidence, the Court may take judicial notice of the contents of its own files. See ITT Rayonier, Inc. v. U.S., 651 F.2d 343 (5th Cir. 1981); Florida v. Charley Toppino & Sons, Inc., 514 F.2d 700, 704 (5th Cir. 1975). Following this trial, the Court reviewed the testimony offered at the Sale Hearing.

[6] The testimony about FNG conducting diligence in Europe was not substantiated by testimony at trial; however, the Court finds the testimony at the Sale Hearing, close in time to the actual diligence conducted, more credible than any testimony at trial as to diligence conducted given the almost year and a half passage of time between FNG's diligence and the trial.

9

in all aspects of the marketing, diligence and sale of the Debtor and the Court finds the testimony of Mr. Colmer at the Sale Hearing to be credible and reliable[7].

On June 9, 2006, FNG and Oris executed the APA and a copy was filed with the Court on June 10, 2006. The initial purchase price, subject to adjustments for inventory, was $6.3 million with $4.3 million attributed to the real property and $2.0 million attributed to the inventory, both on-site and off-site. The Court approved the sale to FNG on June 19, 2006 and the parties scheduled the closing for June 23, 2006.

### B. The Inventory Count

Section § 1.4.1 of the APA provides that the "Purchaser shall conduct a physical inventory commencing on a day designated by Purchaser that is no earlier than the day of the auction....and no later than the day before the scheduled Closing Date (the "Valuation Date") to identify and count the number of units of Saleable Inventory ...to be acquired by the Purchaser at the Closing. Representatives of Seller shall be entitled to observe the physical inventory and shall be available to provide assistance as Purchaser may require in conducting the physical inventory." The auction was held, FNG was approved as the purchaser on June 19, 2006, and the sale closed on June 23, 2006. Accordingly, pursuant to the APA, FNG was responsible for conducting a physical inventory sometime between June 19, 2006, the auction date, and June 23, 2006, the closing date, which would constitute the Valuation Date.

---

[7] Whether FNG visited any European off-site suppliers or not does not change the outcome of the Court's ruling. Certainly FNG had the opportunity to conduct diligence at the off-site suppliers and its decision to conduct or not conduct such diligence may have created this off-site inventory accounting dispute.

The testimony at trial of Glen Riley, Jr.[8], which was undisputed and which this Court finds credible, was that an inventory count was taken, but not by FNG, as required in the APA. Mr. Riley testified that on the morning of June 21, 2006, he expected eight employees from FNG to arrive on-site to take an inventory count; however, only John Sherrick, the accounting manager at Flex-N-Gate Company, arrived (Trial Tr. vol. 1, 17, Sept. 25, 2007). Mr. Riley further testified that he, along with an additional 30-50 Oris employees, spent two days taking inventory with Mr. Sherrick observing. Id.

Mr. Riley further testified that the he was told that the inventory count had to be complete by the morning of June 23, 2006, the scheduled Closing Date, because material moves every day and the count from one day to the next would vary and that there would be no way to go back and recreate the count (Trial Tr. vol. 1, 64-65, Sept. 25, 2007). To that end, Mr. Riley, with the help of Oris employees and with Mr. Sherrick observing, spent two days, June 21-22, 2006, counting the Debtor's inventory, both on-site and off-site.

First the on-site inventory was taken. The process used to count the on-site inventory was explained in great detail at trial; however, the Court need not examine the methodology used because there is no real dispute as to the on-site inventory count and adjustments taken thereto, discussed in detail below.

With respect to off-site inventory, namely inventory already paid for but located off-site, Mr. Riley testified that he contacted the materials procurement manager for each of the off-site facilities and requested a list of part numbers and the quantities of all materials that had been

---

[8] Mr. Riley was the Material Production, Planning & Logistics Manager at Oris for over eight years and was responsible for purchasing, production control, material procurement, logistics, and warehouse management.

11

prepaid as of that date (Trial Tr. vol. 1, 20, Sept. 25, 2007).  After receiving the information from each supplier via electronic mail, Mr. Riley resent the email asking them to confirm the numbers were correct (Trial Tr. vol. 1, 21, Sept. 25, 2007).  When the suppliers confirmed the numbers, Mr. Riley took those counts and added them to a spreadsheet which contained the on-site inventory count.  Id. at 21.  According to the testimony from Mr. Riley the off-site inventory was primarily located at eight major suppliers, including suppliers in Canada, and that while a representative from FNG did not visit every off-site supplier, a representative from FNG did visit two suppliers in Canada to verify the stock Oris reported as prepaid.  Id. at 48.

From the inventory count of both on-site and off-site inventory, Mr. Riley prepared a spreadsheet, Plaintiff's Exhibit 14, which shows a total inventory count of $2,860,880.35, comprised of $1,613,414.27 of "Inhouse Materials" and $1,247,466.07 of "Outside/Prepaid Materials" (Trial Tr. vol. 1, 67-8, Sept. 25, 2007).  Mr. Riley and Mr. Jim Jennings, both from Oris, and Mr. Sherrick, from FNG, all signed off on this inventory count (Trial Tr. vol. 1, 21, Sept. 25, 2007).  Mr. Colmer also testified that his understanding was that, on the Valuation Date, June 22, 2006, just prior to closing, the total inventory count was agreed upon with a value of approximately $2.860 million (Trial Tr. vol. 1, 117, Sept. 25, 2007).

### C. Purchase Price and the Modification to the APA

With respect to the $6.3 million Initial Purchase Price, pursuant to § 1.2.1 of the APA, the Purchaser was to pay to Oris $6.3 million "subject to adjustment based on the Inventory Value as follows: (i) if the Inventory Value of the Saleable Inventory is greater or less than $2.0 million, then the Initial Purchase Price shall be increased by the amount that such Inventory Value exceeds $2.0 million or decreased by the amount that such Inventory Value is less than

12

$2.0 million, as applicable...."  At closing, pursuant to the APA, FNG was to pay $5.8 million, having already put up a $500,000 deposit being held by the Debtor, with $4.3 million payable to the Debtor and with $2.0 million placed in an interest bearing escrow account[9] (Trial Tr. vol. 1, 88, Sept. 25, 2007).  This, however, did not occur.  Prior to closing, Oris informed FNG that it would need an additional $1.4 million disbursed, rather than escrowed, at closing to pay certain secured lenders (Trial Tr. vol. 2, 224, Sept. 26, 2007).  FNG honored the request, based on the representation of Oris that there was at least $1.4 million in inventory, whether on-site or off-site, which FNG agreed with, and disbursed $5.7 million and escrowed the remaining $600,000[10] (Trial Tr. vol. 1, 88, Sept. 25, 2007; Trial Tr. vol. 2, 225, Sept. 26, 2007).  This modification to the APA is contained in that certain Escrow Agreement, dated June 23, 2006, between Oris, Flex-N-Gate Alabama, LLC, a subsidiary of FNG, and LaSalle Bank N.A. (the "Escrow Agreement").

Specifically, with respect to modifying the APA,  section 1.1(a) of the Escrow Agreement provides that: "By execution of this Agreement, Seller and Purchaser hereby agree to modify the Asset Purchase Agreement to (1) provide for the immediate release of $1,400,000.00 for application to the Purchase Price for the Inventory, and (2) condition payment of the balance of the Purchase Price on both (x) confirmation of the Inventory Value adjustment and final determination of the Purchase Price as provided in Section 1.5.2 of the Asset Purchase

---

[9]$1.5 million to be paid by the Purchaser at closing in addition to payment by Oris of the $500,000.00 deposit being held in escrow by Oris.

[10] In reality, the full $2.0 million was escrowed and then $1.4 million was immediately disbursed back out of the escrow account.  See §1.1(a) of the Escrow Agreement.  The exact details of the transaction are not important to the dispute at hand.  There is no dispute the $1.4 million was released and $600,000 remained in escrow as of the filing of this adversary proceeding.

13

Agreement, and (y) Purchaser's receipt of a title insurance policy that complies with the conditions set forth in Section 10.3.5 of the Asset Purchase Agreement." Once those conditions are met, section 3.1 of the Escrow Agreement provides for release of the funds only upon receipt of a written notice from the Purchaser. No other modifications to the APA are provided in the Escrow Agreement.

      **D.**      **The Inventory Valuation Adjustment**

In the APA, the Purchase Price was subject to adjustment either upward or downward once the final Inventory Value adjustment was taken as set forth in § 1.2.1 of the APA. The Inventory Value of the Saleable Inventory, as defined in § 1.4.4 of the APA, is the "book value determined by multiplying the number of units by the unit cost" as set forth in Schedule 1.4.2. To determine the Inventory Value, the first step is to determine what constitutes Saleable Inventory. Section 1.4.2 defines "Saleable Inventory" as "useable Inventory with respect to the parts identified in Schedule 1.4.2, as such schedule may be modified or supplemented by mutual agreement of Seller and Purchaser on or before the Valuation Date, that can be sold by Purchaser in the ordinary course of business within six (6) months after the Closing, as determined by the Purchaser, in its reasonable discretion and after consultation with Seller." "Inventory" is broadly defined in § 1.1.2 and includes generally all inventory of the Debtor except parts listed on Schedule 1.4.2 that are not Saleable Inventory and certain other exceptions not relevant to this adversary proceeding. Thus the issue is what was the total "Inventory" listed on Schedule 1.4.2 and what, of the inventory on that schedule, was "Saleable Inventory." Therein lies the issue in this adversary proceeding.

14

Schedules (doc. no. 244) to the APA were also filed with the Court, on June 16, 2006, a few days after the APA was executed and filed with the Court. At that time, Schedule 1.4.2[11] entitled "Saleable Inventory Schedule" listed Oris part numbers, part descriptions and per unit values that FNG intended to purchase; however, the maximum quantity column for each part was left blank. Schedule 1.4.2 was prepared by FNG based on information provided by Oris from an inventory count taken in May 2006 (Trial Tr. vol. 2, 199-200, 256-57, Sept. 26, 2007). At the time Schedule 1.4.2 was prepared, no inquiry was made by FNG as to where any of the inventory was located, specifically whether it was off-site or on-site despite the fact that FNG knew, from its due diligence and from correspondence with Mr. Colmer, that Oris maintained inventory off-site (Trial Tr. vol. 2, 257, Sept. 26, 2007; Trial Tr. vol. 1, 100, Sept. 25, 2007).

Schedule 1.4.2 was never fully completed and the sale transaction closed on June 23, 2006 without a final Inventory Valuation adjustment and without knowing the final Purchase Price (Trial Tr. vol. 2, 212-15, 223, Sept. 26, 2007).

### E.    On-Site Inventory Adjustment

The initial inventory count, as reflected in Mr. Riley's spreadsheet, Plaintiff's Exhibit 14, shows a total inventory count valued at $2,860,880.35. This figure was not challenged and, according to Mr. Riley's testimony, was signed off on by a representative from FNG (Trial Tr. vol. 1, 21, Sept. 25, 2007).

Somehow between the initial inventory count, conducted June 21-22, 2006, and later correspondence, the total inventory value, from the Defendants' perspective, dropped from the

_____

[11]The schedule is actually labeled "Schedule 1.4.3 Saleable Inventory" in error. At trial, neither party disputed that the schedule was mislabeled. A review of the schedules, as filed,

$2,860,880.35 to $2,814,003.00. See Defendants' Post-Trial Reply Brief (adv. proc. doc. no. 41). The Defendants assert, in the Defendants' Post-Trial Reply Brief, that the starting inventory value was $2,814,003.00. Although Mercedes asserts in its Post-Trial Brief (adv. proc. doc. no. 36) that the starting value of the inventory was the $2,860,880.35, as evidenced by Mr. Riley spreadsheet, Plaintiff's Exhibit 14, it offers to use the Defendants' figure of $2,814,003.00 to simplify the issue. The Court will not attempt to reconcile these figures but will use the Defendants' figures, which results in a slightly lower total inventory value.

Following closing, certain adjustments to the on-site inventory were requested by FNG and honored by Oris (Trial Tr. vol. 1, 156-58, Sept. 25, 2007). This is not disputed. Defendants assert that $472,974.00 in adjustments to on-site inventory were requested and agreed to, reducing the total inventory count, less this adjustment, to $2,341,029.00. See Defendants' Post-Trial Reply Brief, p. 2. Mercedes asserts that FNG requested, and Oris honored, $495,335.31[12] in adjustments resulting in a total inventory count of $2,365,545.04, a slightly higher figure. At trial, Mr. Sleiman admitted the amount of the adjustment was "excessive" and most likely caused by lack of inventory control, a problem that, if true, could have and should have been detected prior to closing and is just another example of the lack of thorough due diligence on the part of FNG (Trial Tr. vol. 1, 163, Sept. 25, 2007). There is no dispute that Oris adjusted the on-site inventory as per the request from FNG. Therefore, the Court will proceed using the Defendants' $2,341,029 figure which was the figure discussed throughout trial as the

---

shows a second Schedule 1.4.3 following the Saleable Inventory schedule entitled "Service Parts Inventory" matching the description of § 1.4.3 of the APA.

[12] This amount is a total of the "inhouse adjustments", $439,653.83, and the "outside/prepaid materials", $55,681.48, found on Plaintiff's Exhibit 14.

16

total Inventory Value, after the adjustment to on-site inventory, subject to off-site adjustments, if any.

**F.      Post-Closing Actions with respect to Off-Site Inventory**

At trial, Mr. Riley testified that, post closing, all off-site inventory was addressed to FNG and handled and processed by Mr. Vance, from FNG, which Mr. Sleiman confirmed in his testimony (Trial Tr. vol. 1, 164-165, Sept. 25, 2007).  Mr. Riley stated that the off-site suppliers copied him on the packing slips and that, in early August 2006, Mr. Riley and Mr. Vance sat down and went through their numbers and each confirmed that approximately fifty percent of the off-site inventory had arrived as of August 1, 2006 (Trial Tr. vol. 1, 49-50, 53-54, Sept. 25, 2007).  Specifically, of the $1,222,708.53 of off-site inventory listed on Mr. Riley's spreadsheet, $591,048.53 had arrived as of August 1, 2006 (Trial Tr. vol. 1, 159, Sept. 25, 2007).

At trial, Mr. Sleiman stated that as of August 1, 2006, FNG confirmed receipt of $1,709,369 consisting of approximately $1.1 million in on-site inventory and $609,369.00 of off-site inventory, a figure slightly higher than that of Mr. Riley (Trial Tr. vol. 1, 159, Sept. 25, 2007).

Defendants' Exhibit 113 was not offered into to evidence; however, the testimony surrounding the exhibit is that it is a series of emails in which Mr. Zsebok confirmed that FNG received at least $1,709,369.00 in inventory and that, as $1.40 million was released at closing, an additional $309,369 could now be released from the escrow account (Trial Tr. vol. 1, 132, Sept. 25, 2007).  Testimony at trial further explained that in the email chain, there was an email confirming that figure from counsel for the Debtor in which counsel for the Debtor sends an email to Mr. Zsebok stating that he will draft a document to authorize the partial release of funds

17

in the amount of $309,369.00[13] (Trial Tr. vol. 1, 133, Sept. 25, 2007).   Mr. Sleiman and Mr. Zsebok testified that the $1,709,369.00 was agreed to by both FNG and Oris as the figure for both on-site and off-site inventory as of August 1, 2006 (Trial Tr. vol. 1, 169, Sept. 25, 2007; Trial Tr. vol. 2, 242, Sept. 26, 2007).  The $309,369, however, was not released.

Again, the testimony of Mr. Zsebok confirmed that FNG received $1,709,369 worth of total inventory by August 1, 2006 (Trial Tr. vol. 2, 234, Sept. 26, 2007).  Mr. Zsebok testified that he believed the $1,709,469 constituted the final Inventory Value adjustment and based on that FNG agreed to release $309,369 from the escrow (Trial Tr. vol. 2, 236-37, Sept. 26, 2007). Mr. Zsebok testified that he believed this resolved the escrow, any remaining funds would be returned to FNG and that FNG agreed to work with Oris on the approximately $600,000 of outstanding off-site inventory (Trial Tr. vol. 2, 236, Sept. 26, 2007).  Specifically, Mr. Zsebok testified that with respect to any inventory <u>received</u> after this "supposed adjustment period" FNG would "maybe" consider purchasing it (Trial Tr. vol. 2, 234, Sept. 26, 2007).  However, Mr. Zsebok later stated that FNG would cut Oris a check for any additional inventory received that Oris was "able to prove to FNG that it received" (Trial Tr. vol. 2, 236, Sept. 26, 2007).  In an email dated August 10, 2006 from Mr. Zsebok to counsel for the Debtor, Mr. Zsebok confirmed that FNG owed Oris the $309,369.00 but does not assert that this resolved all outstanding off-site inventory issues, nor does he assert that, upon payment of the $309,369.00, that the remaining escrowed funds should be released back to FNG.  <u>Defendants' Exhibit 18</u>.  Specifically, in the email, Mr. Zsebok writes to counsel for the Debtor that "[a]s inventory comes in from outside

_____

[13]Because Defendants' Exhibit 113 was not offered into evidence and no testimony was solicited on this particular point, the Court has no way of knowing when these emails were sent other than that they were sent post-closing but prior to this adversary proceeding being instituted.

locations we will make similar requests of the escrow agent or directly fund your trust account once the amount exceeds the $2 million in escrow." Id. From this correspondence, it appears that during the first part of August 2006, FNG believed the total inventory count could exceed the $2.0 million paid at closing. This is consistent with the Debtor's understanding. In responding to Mr. Zsebok's email, on August 11, 2006, counsel for the Debtor wrote to Mr. Zsebok that his understanding is that "FNG owes Oris another $309,369 +/- for the onsite inventory...and is supposed to escrow another $34,000 in anticipation of final confirmation of the outside/offsite inventory numbers." Id.

Post-closing, there were a series of emails regarding confirmation of off-site inventory with FNG taking the position that they did not have to pay for off-site inventory until it was received (Trial Tr. vol. 1, 133, Sept. 25, 2007; see also Defendants' Exhibit 113). Mr. Colmer testified, in no uncertain terms, that he did not agree with this practice but, at that point, the Debtor was simply trying to get whatever proceeds it could (Trial Tr. vol. 1, 133, Sept. 25, 2007). Mr. Colmer further testified that this was not the deal, that the Debtor transferred all title to all assets, wherever located, at closing and that the risk of loss shifted to FNG at closing. Delivery of off-site inventory was not a condition precedent to payment for off-site inventory. The Purchaser was buying the inventory owned by Oris, whether on-site or off-site, as of the Closing Date that was Saleable Inventory subject to certain adjustments. The inventory being purchased was in various stages of production and could have been raw material, work in progress or in final form.

19

Mr. Riley testified that around the time of closing, Oris was experiencing a fifty to sixty percent scrap rate for off-site material[14] (Trial Tr. vol. 1, 31-32, Sept. 25, 2007). It appears that part of FNG's position post closing is that they do not feel they should be responsible for paying for these items, particularly since some of the inventory was scrap.

After agreeing that approximately $609,000.00 of off-site inventory had been received, Mr. Sleiman testified that after August 1, 2006, an additional $105,000-$110,000 of off-site inventory arrived at the McCalla facility, which Mr. Zsebok confirmed and estimated at $110,000 (Trial Tr. vol. 1, 169, 178, Sept. 25, 2007; Trial Tr. vol. 2, 234, Sept. 26, 2007). Funds to Oris for this additional inventory were not released from escrow.

At trial, the Defendants asserted that the funds were never released because the documents authorizing their release were never drawn up, which counsel for the Debtor had suggested he would do (Trial Tr. vol. 2, 246, Sept. 26, 2007). According to section 3.1 of the Escrow Agreement, the "Escrow Agent shall only disburse amounts held in the Escrow Account upon receipt of a written notice ("Disbursement Request") from Purchaser...."

No funds were released from the escrow account post-closing and on September 13, 2006, the Debtor instituted this adversary proceeding against the Defendants. As a result of the settlement conferences, held after the filing of this adversary proceeding as discussed above, the

---

[14] Mr. Sleiman testified that while he was able to confirm that rate when they followed the supply chain after closing, he was unaware of Oris' scrap rate at the time of closing (Trial Tr. vol. 1, 172, Sept. 25, 2007). It appears that the Purchaser's due diligence could have uncovered this easily discoverable fact. Further, though Mr. Sleiman may not have been aware of this scrap rate, given the significant personnel FNG dedicated to this acquisition in the weeks leading up to closing, it seems anyone interested in purchasing a bankrupt entity could have used part of that personnel to analyze the supply chain, which would have uncovered the high scrap rate.

Defendants released the entire $600,000.00 from escrow even though they dispute having received enough off-site inventory to total the $2,000,000.00 paid for inventory.

## G. Summary of Dollar Dispute to be Resolved[15]

In short, the Court concludes that the Plaintiff's position is that the Defendants received $1,141,029.00 of on-site inventory and $1,200,000.00 of off-site inventory for a total inventory value of $2,341,029.00. The Defendants paid only $2,000,000.00 ($1.4 million disbursed from escrow at closing plus $600,000.00 later disbursed from escrow per the settlement agreement) leaving a balance due of $341,029.00.

A summary by the Court of the Defendants' position is complicated at best. At trial, the Court understood that FNG acknowledged that they received approximately 1.1 million dollars of on-site inventory and approximately $719,000.00 ($609,000.00 as of August 1, 2006 plus $110,000.00 thereafter) of off-site inventory for a total inventory value of $1,819,000.00. The Defendants paid $2,000,000.00 and argue that they overpaid for the off-site inventory and owe nothing further. Notwithstanding the forgoing, in their post-trial brief Defendants argue that they only agreed to purchase $445,343.61 of off-site inventory plus on-site inventory of $1,141,029.00 for a total inventory of $1,586,372.61.

## CONCLUSIONS OF LAW

It is interesting to note that these two sophisticated parties, who continue to do business together to this day (Mercedes as the substituted party in interest and FNG), could not resolve what amounts to a $300,000.00 contract dispute either through direct negotiations or through the two settlement sessions the parties attended. The very fact that the parties presented chart after

21

chart, with few similarities or overlap in the actual dollar amounts, indicates to this Court lack of meaningful communication between the parties as they do not appear to ever have been working from the same page or with the same figures. The Court appreciates Mercedes conceding to the Defendants' figures despite their documents showing different figures in an attempt to simplify this matter on the merits.

Nevertheless, the dispute remains. To date, the Defendants have paid $6.3 million and allege that, while it paid $2.0 million for inventory, it received less than $2.0 million in inventory and owes nothing further[16]. Plaintiff asserts that FNG breached its contract namely by (1) failing to perform an Inventory Count, (2) failing to identify Saleable Inventory before the Valuation Date, and (3) failing to pay the full Purchase Price[17].

Under any of these theories of recovery, the Plaintiff must establish a breach of contract. To establish a breach of contract, the Plaintiff must show (a) the existence of a valid contract; (b) Plaintiff's performance under the contract, (c) Defendants non-performance under the contract, and (d) damages. See DeVenney v. Hill, 918 So.2d 106, 116-17 (Ala. 2005). There is no dispute that the APA and the Escrow Agreement are both valid contracts. Additionally, Plaintiff's performance under either contract has not been challenged (aside from the title policy

---

[15] In this paragraph this Court has attempted to summarize what it finds to be the dollar dispute even though the testimony and documents offered at trial are unclear and inconsistent.

[16] In the Defendants' Answer, the Defendants assert that the Defendants' payment obligations are dependent upon the Plaintiff's providing the Purchaser a policy of title insurance, pursuant to § 1.1(a) of the Escrow Agreement  This issue, however, was resolved prior to trial, title insurance was provided to the Defendants, though the timing of this was not made known to the Court.

[17] The Plaintiff also asserts the Defendants breached the APA by shifting the risk of loss after the Closing Date to Oris and requiring receipt of delivery with respect to the off-site inventory. Because this argument really revolves around a determination of the Purchase Price, the Court will discuss those allegations together.

22

issue that was resolved prior to trial). That leaves the Plaintiff only to prove that the Defendants failed to perform and any damages. The Court will consider each alleged breach separately below.

### A.      Failure to Perform an Inventory Count

Pursuant to § 1.4.1 of the APA, FNG was to "conduct a physical inventory." There is no dispute that rather than conduct a physical inventory, FNG sent one representative, Mr. Sherrick, to observe the inventory count leaving Mr. Riley, of Oris, to conduct the inventory count with the assistance of 30-50 Oris employees (Trial Tr. vol. 1, 17, Sept. 25, 2007). While technically required of the Purchaser, FNG, Oris ultimately completed the inventory count and both sides signed off on the spreadsheet prepared by Mr. Riley.

With respect to off-site inventory, Mr. Sleiman testified that FNG did not have access to a listing of vendors holding off-site inventory prior to closing making an inventory count with respect to off-site inventory impossible (Trial Tr. vol. 1, 179, Sept. 25, 2007). This, however, is inconsistent with the testimony of Mr. Colmer who testified that FNG visited two off-site vendors prior to closing as part of its due diligence.

While it appears to the Court that FNG failed to perform the inventory count and thus did not comply with the terms of APA, and despite the anti-waiver provision in § 12.4 of the APA, Oris waived this requirement by conducting the inventory count themselves. Further, even if the Court were inclined to find that this provision could not be waived, the Court was not presented with any evidence of damages on this issue. Specifically, the cost to Oris in performing the count or, quite possibly, even the total cost of this litigation which may have been avoided had

23

FNG performed its contractual obligations under the APA at the start. Without any evidence of damages, a breach, if one exists, does not result in a monetary award to the Plaintiff.

**B.      Failure to Identify Saleable Inventory Prior to the Valuation Date**

Section 1.4.2 of the APA requires that Saleable Inventory by determined on or before the Valuation Date, June 22, 2006. This again was not done and that fact is not disputed; however, both the APA and the Escrow Agreement provide for this possibility. In § 1.5.2 of the APA , if the Purchase Price, which was based on the Inventory Value adjustment which is based on Saleable Inventory, was not finalized by the Closing Date, $4.3 million would be paid to Oris with the remaining $2.0 million, of the Initial Purchase Price, placed in an interest bearing escrow account. As discussed above, the APA was modified by § 1.1(a) of the Escrow Agreement which relates to the conditions that must be met before funds can be released from escrow. Section 1.1(a) does not address when the Inventory Value adjustment, which is dependent on a determination of Saleable Inventory, is to be calculated, it simply acknowledges that this calculation was not done pre-closing. The Court therefore finds based on both the APA and the Escrow Agreement that the failure to determine Saleable Inventory prior to the Valuation Date was not a breach of either agreement as both specifically contemplated that certain adjustments to inventory would have to be done post-closing.

**C.      Failure to Pay the Full Purchase Price**

This is the heart of the dispute. To get to the issue, the Court must determine the Purchase Price. The Initial Purchase Price, pursuant to § 1.2.1 of the APA, was $6.3 million. To get to the final Purchase Price, all Inventory Value adjustments had to be taken. As noted in the Findings of Fact, this Court finds the total Inventory Value was $2,814,003.00.

24

Once the Inventory Value was known, the only outstanding issue was what, if any, adjustments should be taken so that the final Purchase Price could be determined. As noted earlier, though the Court is of the opinion that the spreadsheet prepared by Mr. Riley, Plaintiff's Exhibit 14, provides a greater explanation of how the figures were calculated and was an on-going document being constantly updated and thus more reliable, the Court will use the Defendants' figures in reaching its decision, based in part on Mercedes' willingness to use the Defendants' figures as well. Taking the Defendants' on-site adjustment value of $472,974.00 from the Inventory Value of $2,814,003.00, the adjusted inventory value, after on-site inventory adjustments, is $2,341,029.00. The Defendants assert that, after the on-site inventory adjustment, the Purchaser agreed to purchase $1,141,029.00 of on-site inventory. That leaves a total, unadjusted off-site inventory value of $1,200,000.00, as of the Closing Date, using the Defendants' figures. From this figure, the Court must determine what, if any, off-site inventory adjustments are appropriate.

**(1)    The APA is clear and unambiguous and does not require receipt.**

First, the APA does not distinguish between on-site and off-site inventory. At trial, however, the Defendants argued that the pattern and practice between the parties, post-closing, was for the parties to continue to work on identifying the off-site inventory and that, when receipt was confirmed by FNG, FNG would be able to release money out of the escrow agreement (Trial Tr. vol. 1, 135-36, Sept. 25, 2007). The Defendants failed to prove and the Court has not found a "receipt" requirement in either the APA or the Escrow Agreement.

The Defendants argue that they could not determine if inventory was "Saleable" until it was received at the facility and that it was reasonable to wait until the off-site inventory arrived

25

at the facility in McCalla to make a determination of what was saleable and what was not (Trial Tr. vol. 1, 176, Sept. 25, 2007). Mr. Sleiman also testified that in day-to-day operations FNG had a certain comfort level with its vendors based on their history and their performance but that with the off-site inventory vendors he had no way of knowing what was saleable and what was not (Trial Tr. vol. 1, 177, Sept. 25, 2007). The Defendants argument is not persuasive because this "comfort level" could have been achieved with off-site vendors just as easily by tracking past performance and history and by conducting thorough due diligence. Further, if the Purchaser could not determine Saleable Inventory, with respect to off-site inventory, until it arrived then the Purchaser should have required receipt of off-site inventory in the APA. Defendants agreed to the terms in the APA without requiring receipt of this off-site inventory plus FNG had access to Oris' outside vendors and indeed, according to Mr. Colmer's testimony, FNG visited and conducted diligence at two off-site vendors. If in fact FNG, a sophisticated corporate entity with a history of mergers and acquisitions[18], had no "comfort level" with respect to Oris' off-site vendors and inventory why did it agree to purchase the assets of an entity where off-site inventory comprised over 50% of the inventory?

In this case, FNG agreed to the terms of the APA, including purchase of all inventory, which it knew included off-site inventory. Further, FNG knew it had the opportunity to determine what was "Saleable Inventory" but the key date and determination, pursuant to the contracts, was whether the inventory was "Saleable Inventory" as of the Closing Date.

---

[18]Mr. Zsebok, Director of Merger and Acquisitions, testified at trial about five recent mergers and acquisitions that immediately came to mind: (1) The Venture Group, a publicly traded company, (2) Veltri Metal Products, (3) Paragon Metal Forming, (4) Duhr, and (5) 51% interest in DDM Plastics (Trial Tr. vol. 2, 194, Sept. 26, 2007).

FNG's position now which attempts to impose a requirement of receipt as to inventory, found nowhere in either contract, shifts the risk of loss from the Purchaser onto the Plaintiff in clear contradiction of the APA.   This risk of loss is exaggerated because the Defendants failed to timely determine the amount of off-site inventory.  The Defendants delay may have resulted in some inventory not being utilized that could have been utilized had they properly and timely performed their inventory county.  Section 8.3 of the APA provides that "[s]imultaneous with completion of the Closing, all risk of loss or damage to or destruction of the Assets, in whole or in part shall be and thereafter remain with Purchaser."  Pursuant to the APA, at closing, the Debtor quitclaimed its interest in all of the assets, including all inventory, to FNG, and, pursuant to the APA, the risk of loss shifted to FNG (Trial Tr. vol. 1, 90, Sept. 25, 2007).

### (2)  The Defendants Purchased More Than Simply a sum total of the Off-Site Inventory Listed on Schedule 1.4.2

In their post-trial brief, the Defendants assert that Schedule 1.4.2 only contained $445,343.61 of off-site inventory[19], as specifically listed in Exhibit A (adv. proc. doc. no. 38). The Defendants further argue in their brief that, at most, they can only be required to purchase the $445,343.61 of off-site inventory listed on Schedule 1.4.2 because § 1.4.2 of the APA defines "Saleable Inventory" as the inventory listed on Schedule 1.4.2.  Therefore, the Defendants assert, any off-site inventory not listed on Schedule 1.4.2 was not being purchased by the Purchaser.

The Defendants' arguments on this point are not persuasive.  First, this position was not asserted at trial and no evidence or testimony was offered to support this position.  In fact, the

Case 06-00813-TOM11    Doc 904    Filed 04/08/08    Entered 04/08/08 09:36:54    Desc
Main Document      Page 27 of 32

trial testimony is inconsistent with this argument. Second, section 1.4.2 goes on to read "as such schedule may be modified or supplemented by mutual agreement of Seller and Purchaser on or before the Valuation Date." As discussed above, the Escrow Agreement modifies the APA in that the requirement to determine "Saleable Inventory" on or before the Valuation Date was eliminated and no time frame for determining "Saleable Inventory" was established. Defendants point to § 1.1.2 "Inventory" for the requirement that any parts identified in Schedule 1.4.2 that are not otherwise included in the Inventory by mutual agreement in <u>writing</u> (emphasis added) of the Seller and Purchaser shall be Retained Assets of Oris. Thus, the Defendants' assertion that since there is not a written agreement to include any off-site inventory above and beyond that listed on Schedule 1.4.2, it is not obligated to purchase any additional off-site inventory is flawed. This misconstrues § 1.1.2 and the definition of "Inventory".

Inventory is broadly defined and is not limited to parts listed on Schedule 1.4.2. This Court reads § 1.1.2 to mean that inventory is this huge assortment of items, work in progress, raw materials, etc. and that items listed on Schedule 1.4.2 that are not otherwise included in Inventory can be added to the Inventory by the mutual written agreement of the parties. It does not require each piece of inventory to be listed on Schedule 1.4.2 and, in fact, § 1.4.2 "Saleable Inventory" provides that Saleable Inventory is any "Inventory" as defined in § 1.1.2 listed on Schedule 1.4.2 provided that that schedule can be modified by the agreement of the parties, written or otherwise, no distinction is made. The Court believes (1) that the burden of completing Schedule 1.4.2 was on the Purchaser, (2) that the Purchaser failed to complete the

---

[19] After review of the trial testimony, it appears that this argument by the Defendants in their post-trial pleadings is the first time the Defendants raised the issue of what off-site inventory they agreed to purchase.

28

schedule and (3) that the Purchaser is now trying to get the benefit of its own failure, which created this dispute. The total off-site inventory FNG agreed to purchase is all of the off-site inventory owned by Oris at closing. No testimony or evidence was presented to this Court taking exception to certain off-site inventory included in the original count other than a few emails from vendors, more than a year after the closing, saying the goods will not be shipped, the invoices were "phantom" invoices or the goods were received prior to the closing[20] (Trial Tr. vol. 2, 272-75, Sept. 26, 2007; see also Defendants' Exhibits 50-52). Because the $1.2 million of the total inventory count of $2,341,029 attributable to off-site inventory is a reduction from the original inventory count, the Court will assume the few vendor issues discussed in the emails were taken into account in coming to the $1.2 million estimate for off-site inventory.

At trial, based upon the testimony, the Defendants and Plaintiff acknowledged that the $2,341,029 figure includes $1.2 million of off-site inventory and that the $1.2 million is an unadjusted figure. Defendants contend they are entitled to take an adjustment to the $1.2 million figure. Even if the Court were inclined to allow such an adjustment more than a year after the sale closed, the Defendants failed to assert what the proper adjustment would be only asserting that they did not receive $2.0 million worth of inventory and thus the Plaintiff is not entitled to any additional funds. Without providing an adjustment value, the Court concludes that no

---

[20] The Court notes that at trial the Defendants did not argue that they didn't agree to purchase this off-site inventory that, according to a cursory review by this Court of the Defendants' Exhibit A to Defendants' Post-Trial Brief, at least in part was NOT listed on Schedule 1.4.2. This argument, that FNG only agreed to purchase the off-site inventory listed on Schedule 1.4.2 was advanced post-trial, as noted above, and the Court finds that position clearly inconsistent with their actions in attempting to track down this off-site inventory. Why FNG would attempt to track down off-site inventory it did not agree to purchase makes no sense and thus reinforces the Court's belief that the argument that they were not obligated to pay for any off-site inventory not on Schedule 1.4.2 is not persuasive.

29

adjustment is due to the Defendants.  The Court therefore finds that the "Saleable Inventory" was modified from the original Schedule 1.4.2 and included $1.2 million worth of off-site inventory for a total Inventory Value of $2,341,029, subject to a zero dollar adjustment.  The Plaintiff, having been paid $2.0 million for inventory, is entitled to an additional $341,029.00.

### E.    Unjust Enrichment

Further, even if the Court were to agree with the Defendants and find that any changes to the off-site inventory being purchased had to be in writing, the Plaintiff argues that the Defendants owe the Plaintiff based on a theory of unjust enrichment.  To succeed on a claim of unjust enrichment, the Plaintiff must show that (1) it conferred a benefit on Defendants, (2) the Defendants accepted and retained the benefit, and (3) it would be inequitable for the Defendants to retain the benefit without paying for it.  Nova Info. Sys., Inc. v. Greenwich Ins. Co., 365 F.3d 996 (11th Cir. 2004).

In the Debtor's Notice of Filing Affidavit of Andreas Budde in Support of the Voluntary Petition and Other Related Filings and Motions (the "Affidavit") (doc. no. 13), filed on the Petition Date, the Ms. Budde asserts that Debtor uses the "just-in-time" supply method, which is standard in the automotive industry and is used by the Debtor's OEM customers.  With the just-in-time supply method, the Debtor did not maintain a significant inventory of the components supplied by its suppliers, less than 24 hours in some cases, and relied upon frequent and, in many cases, daily shipments of components from its suppliers to keep its manufacturing facility in McCalla, Alabama operating.  Application at p.2, ¶ 9.  Further, the Debtor used a sole source supply method pursuant to which Oris purchased all of its supply needs for a particular part from one supplier because of the specifications imposed by Oris and its OEM customers.  Application

Case 06-00813-TOM11    Doc 904    Filed 04/08/08    Entered 04/08/08 09:36:54    Desc
Main Document      Page 30 of 32

at p. 3, ¶ 10. The result of using a sole source supply method and just-in-time supply method is that, if a sole source supplier failed to ship an order, the Debtor would likely be forced to shut down less than a day after the missed shipment which would then result in the shutdown of the OEM customer waiting on a particular piece from Oris. Application at p.3, ¶ 12.

Specifically, at trial, Mr. Riley testified that when the inventory was taken, June 21-22, 2006, the supply chain to all of the outside vendors was full (Trial Tr. vol. 1, 70, Sept. 25, 2007). He also testified, corroborating the Debtor's supply method detailed in the Application, that if the supply chain was not full at closing, then FNG would not have been able to supply the customers. Id. Further, during the five to six weeks Mr. Riley was employed by the estate of the Debtor, post-closing and on-site at the McCalla, Alabama facility, Mr. Riley did not know of any instance in which FNG was unable to supply its customers or suffered any downtime. Id.

Given that Mr. Riley was familiar with the off-site inventory necessary to keep the supply chain full, the Court finds it unlikely that of the $1.2 million of off-site inventory FNG only received approximately half of the off-site inventory and yet was still able to maintain production at full capacity. FNG offered no testimony or evidence that it was unable to operate at full capacity. Even if FNG only received half of the off-site inventory, due to the high scrap rate, the Court is of the opinion that FNG received the benefit of full $1.2 million of off-site inventory. Having received the benefit of the full $1.2 million of off-site inventory, there is no dispute that FNG has retained that benefit in continuing to operate and suffering no shortfall of inventory to supply it customers. To allow FNG to retain this benefit without paying for it would be inequitable. Accordingly, the Court finds that FNG cannot retain the benefit of the $1.2 million in off-site inventory without paying for it. To hold otherwise would result in FNG being unjustly

31

enriched at the Plaintiff's expense. Since FNG received the benefit of $2,341,029.00 in inventory and has only paid $2.0 million, FNG owes the Plaintiff $341,029.00.

A separate order, consistent with this Memorandum Opinion, and pursuant to Rule 9021 of the Federal Rules of Bankruptcy Procedure, will be entered.

Dated this the 7th day of April, 2008.

/s/ Tamara O. Mitchell
United States Bankruptcy Judge

32